**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____ :        Civil Action No. 15-3737 (FLW)
                                    :
JACQUELINE POWERS,                  :
                                    :                **OPINION**
                    Plaintiff,      :
                                    :
        v.                          :
                                    :
CAROLYN W. COLVIN,                  :
Acting Commissioner of Social Security, :
                                    :
                    Defendant.      :
_____ :

**WOLFSON, United States District Judge**:

     Jacqueline Powers ("Powers" or "Plaintiff"), appeals from the final decision of the Acting Commissioner of Social Security, Carolyn W. Covlin ("Defendant") denying Plaintiff disability benefits under Title II of the Social Security Act (the "Act") for the 18-month period between December 11, 2009 and May 15, 2011. After reviewing the Administrative Record, the Court finds that the Administrative Law Judge's ("ALJ") opinion was not supported by substantial evidence in the record. Accordingly, the ALJ's decision is remanded for consideration of whether Plaintiff's RFC should include any exertional limitation during the time period of April 2011 and May 2011.

## I.   FACTUAL BACKGROUND AND PROCEDURAL HISTORY

     Plaintiff was born on January 20, 1964, and was 45 years old on the alleged disability onset date of December 11, 2009.[1] A.R. 116 (hereinafter "A.R."). The highest grade of education

_____

[1] Plaintiff's application originally alleged an onset date of December 10, 2010, A.R. 166, but, according to Plaintiff's brief, this date is "acknowledged by both parties to be a typographical error." Pl. Br. at 1 n.1.

1

Plaintiff has completed is 11th grade and she has obtained her G.E.D.  A.R. 32.  Prior to her alleged

disability, Plaintiff worked as a teacher's assistant.  A.R. 33.

On May 25, 2011, Plaintiff applied for social security disability insurance benefits, alleging

disability beginning on December 11, 2009.  A.R. 166-72.  Plaintiff's claim was denied on August

31, 2011.  A.R. 73-78.  Upon reconsideration, the Administration found Plaintiff was disabled as

of May 15, 2011, based on an additional severe mental impairment.  A.R. 84-85, 86-87.  Plaintiff

requested a hearing before an ALJ, which was held on August 15, 2013, before ALJ Joseph M.

Hillegas.  A.R. 27-47.

Plaintiff, who was represented by Abraham Walter, Esq., appeared and testified.  A.R. 31-

47.  On September 23, 2013, the ALJ determined that Plaintiff was not disabled as of the alleged

onset date of December 11, 2009, and issued a decision denying her claim for disability insurance

benefits for the time period between December 11, 2009 and May 15, 2011.  A.R. 11-22.  Plaintiff

requested review by the Appeals Council, which was denied on March 30, 2015.  A.R. 1-6.  On

June 3, 2015, Plaintiff filed the present appeal against Defendant.

### A.    Review of the Medical Evidence

On March 21, 2002, Michael A. Kessler, M.D., performed an MRI of Plaintiff's lumbar

spine.  A.R. 363.  The MRI report concluded that Plaintiff had a "[b]ulging of annulus at [the] L5-

S1 level" and that "[f]acet hypertrophy is mildly indenting the right lateral aspect of the dural sac

at the L3-4 level." A.R. 363.

On March 27, 2002, Plaintiff was examined by Jeffrey M. Warshauer, D.O.  A.R. 362.  Dr.

Warshauer noted that Plaintiff previously had an MRI which showed "some bulging annulus at

L5-S1 and also some facet hypertrophy but not significant nerve root impingement."  A.R. 362.

2

On December 19, 2005, Clifford A. Botwin, D.O., F.A.A.O.S., F.A.O.A.O., examined Plaintiff.  A.R. 360.  Dr. Botwin took X-rays of Plaintiff's cervical spine, which showed "significant discogenic narrowing between C4, 5 and 6 with reversal of the cervical spinal curvature."  A.R. 360.  Dr. Botwin's impression was "[c]hronic cervical strain and sprain with myofasciitis.  Possible disc herniation with discogenic spinal curvature."  A.R. 360.  Dr. Botwin recommended that Plaintiff "just continue with the chiropractor that she's been going to if that helps," to continue anti-inflammatory medication, and recommended an MRI of the cervical spine to "rule out disc herniation."  A.R. 360.

On June 4, 2006, Dr. Kessler performed an MRI on Plaintiff's cervical spine.  A.R. 365. The MRI report provided:

> There is no abnormality of the marrow space.  The craniocervical junction outlines normally.  Mild retrolisthesis of C5 on C6 is demonstrated.  Cervical spinal cord shows no intrinsic signal abnormalities.
>
> At C2-C3 and C7-T1, no abnormality is demonstrated.
>
> At C3-C4, there is a bony spur seen right paracentrally, which minimally encroaches the root entry zone of the right C4 nerve root.  The neuroformina proper are patent.  Facet joints are within normal limits.  The thecal sac is centric.
>
> At C4-C5, C5-C6, and C6-C7, there is mild disc bulging with some minimal posterior bony riding at the C5-C6 level seen and with some mild scalloping of the ventral CSF space noted.  The neuroformina are patent at these levels.  The facet joints show no abnormality.

A.R. 365.  Dr. Kessler's report contained the following impressions:

1.   Posterior bony ridge, C3-C4 right side as described.
2.   Disc bulges, C4-C5 and C6-C7 and mild disc ridge complex, C5-C6 with some mild effacement of the ventral CSF space.
3.   No intrinsic cord abnormality or foraminal encroachment.

A.R. 365.

Plaintiff received primary ob-gyn care from Kristene Whitmore, M.D. *See* A.R. 261-326. On September 25, 2009, Plaintiff sought treatment from Dr. Whitmore,[2] for a urinary tract infection with a possible yeast infection, and she also indicated she had "severe" pain due to spasms when she urinated.  A.R. 290.

On December 23, 2009, Dr. Kessler performed a second MRI on Plaintiff's lumbar spine. A.R. 249-50.  That MRI report noted that Plaintiff's indication was "[l]ow back pain," and provided the following impressions:

1. Multilevel disc bulging, T12-L1 through L5-S1 with mild thecal sac indentation at the L3-L4 and L4-L5 levels again appreciated.
2. No central stenosis or significant foraminal encroachment on an interval basis.

A.R. 249-50.

On February 18, 2010, Dr. Kessler, performed a second MRI on Plaintiff's cervical spine. A.R. 247-48.  The MRI report noted that Plaintiff's indication was "[n]eck pain with radiculitis," A.R. 247, and provided the following impressions:

1. Minimal disc bulge, C3-4 with right paracental posterior ridging minimally encroaching the right C4 root entry zone unchanged.
2. Minimal disc bulging at C4-5 and C6-7 unchanged.
3. Disc ridge complex, C5-6 with retrolisthesis, C5 on C6.  Some encroachment into the right neuroforamen by bony spurring, mildly progressive from prior study.  Active endplate changes also now seen at this level.
4. No intrinsic cord abnormality or other foraminal encroachment.
5. No central stenosis.

A.R. 248.

---

[2] The Court notes that many of Dr. Whitmore's notes are handwritten and illegible.

On December 3, 2010, Plaintiff saw Dr. Whitmore for a consult on possible Botox or InterStim surgery to address her urinary pain and difficulties urinating.  A.R. 272.  Plaintiff declined Botox treatment and opted for InterStim.  A.R. 273.

On December 27, 2010, Dr. Whitmore noted that Plaintiff had "no urethra spasm[s]" and "better bladder function."  A.R. 270.

On January 3, 2011, Dr. Whitmore noted that Plaintiff indicated that, following her InterStim surgery, her symptoms were "99% better."  A.R. 267.  Dr. Whitmore noted that Plaintiff was now able to fully evacuate her bladder when urinating and her urination frequency was reduced by half. A.R. 267.

On April 4, 2011, Dr. Botwin examined Plaintiff.  A.R. 357-58.  Dr. Botwin reviewed her medical history, noting that she has "had chronic neck and back problems for many years," and that "[s]he's been to many pain management specialists, receiving narcotic analgesia as well as epidural steroids and trigger point injections in the past." A.R. 357.  Dr. Botwin also noted Plaintiff "has a severe bladder problem where she has severe interstitial cystitis and had an InterStim stimulating devise with electrodes to help stimulate her bladder," and, although "[s]he's been through extensive physical therapy and other treatment," it had been "without improvement." A.R. 357.  Dr. Botwin's physical examination showed Plaintiff had limited rotation in her cervical spine, and that "[f]lexion lumbar spine is present to 90 [degrees]." 357.  Dr. Botwin noted that X-rays were taken of Plaintiff's cervical dorsal and lumbar spine, which showed "compound mild scoliotic curvature of the dorsal lumbar spine; severe deformity of the cervical spine with reversal of the cervical lordosis; retrolisthesis of C5 on C6 with complete discogenic narrowing at that level." A.R. 357.  Dr. Botwin's impression was "[c]hronic severe pain syndrome.  Bilateral cervical radiculopathy due to severe degenerative disc C5-6."  357.  Dr. Botwin gave Plaintiff names of

5

additional pain management doctors to seek out to help control her pain, and recommended

neurosurgeons and spine surgeons to consider a possible spinal fusion, but stated "[t]here's really

no other treatment I can offer, since she's been through all other sorts of therapy."  A.R. 358.

On April 14, 2011, Plaintiff was examined by Edward Novik, M.D.  A.R. 255-59.  Dr.

Novik noted that Plaintiff had a "long history of neck problems," and was:

> [c]urrently being followed by Dr. Friedman, a pain specialist.  Had trigger point injection, physical therapy, series of cervical epidural steroid injection within the past 6 months, unfortunately without [a] significant improvement in her pain and still complaining of neck pain with headache with radiation to her arms.  Associated with numbness, weakness and paresthesia.

A.R. 255.  Dr. Novik's physical examination of Plaintiff was recorded as follows:

> She is 5'5", 120 pounds.  Heart is regular.  Lungs clear.  Abdomen soft and nontender.  On pain exam, next symmetric.  She has a decreased range of motion in the cervical spine with pain in all directions.  Muscle spasm and tenderness along the cervical, paraspinal muscles.  Diminished motor function in the upper extremity 4/5.  Diminished sensory response bilaterally in the projection of the C6 dermatome.

> The MRI of the cervical spine showed retrolisthesis of C5 and C6 and cervical spinal cord looks normal.  There is a disc ostephyte at C5-C6 level.  Bulging disc at C4-C5, C5-C6 and there is a C3-C4 right paracentral disc herniation.

A.R. 255.  Dr. Novik assessed Plaintiff with cervical radiculopathy and a herniated cervical disc,

A.R. 255, and opined that Plaintiff is a "clear candidate for a surgical intervention" because "all

conservative measures did not provide any significant improvement in her pain."  A.R. 256.

On April 18, 2011, Dr. Whitmore's notes indicated that Plaintiff reported she had a

"bladder spasm" that morning, but indicated that overall her emptying capacity was good, her

bladder spasms had decreased, and that she was able to have intercourse.  A.R. 261.

On May 16, 2011, Plaintiff presented for a neurological evaluation with Victor Ho, M.D.

A.R. 354-55.  Dr. Ho noted that Plaintiff had lumbar spondylosis with disk space degeneration at

L5-L5 and L5-S1, and cervical spondylosis with disk space changes at C4-C5 and C5-C6.  A.R.

354.  Dr. Ho observed that Plaintiff ambulated in a "slow, stooped manner" but also that she was able to ambulate unassisted.  A.R. 354. Upon examination Plaintiff had no focal motor or sensory deficit; no indication of significant reflex changes; no clonus; and she was negative for Hoffman reflex.  A.R. 354.  After examining Plaintiff, Dr. Ho recommended she undergo cervical decompression and fusion surgery with a donor bone graft and stabilization plating.  A.R. 354.

On June 8, 2011, Plaintiff underwent the recommended surgery with Dr. Ho.  A.R. 344-48.  Dr. Ho noted that Plaintiff's hospital stay was "uneventful," A.R. 344, she tolerated the "procedure and went to recovery in stable and satisfactory condition," A.R. 346, and her CT scans showed good placement of the screws.  A.R. 344.  She was discharged with instructions to wear a soft collar and advised to follow up with Dr. Ho in two weeks.  A.R.  344.

On June 21, 2011, Plaintiff presented for a postoperative follow-up with Dr. Ho, who noted that she was doing "quite well."  A.R. 351.  Plaintiff indicated that her neck pain had improved significantly and Dr. Ho observed that she had relatively free range of motion.  A.R. 351. Plaintiff was also not wearing her soft collar and Dr. Ho reminded her that she needed to wear if for six weeks following surgery.  A.R. 351.  Plaintiff also indicated that she had little if any arm pain, but Dr. Ho still advised her to start physical therapy and follow up with him in two months.  A.R. 351. Plaintiff underwent physical therapy from July to December 2011.  A.R. 412-433.

On June 29, 2011, Allan Weisman, M.D. performed a lumbar paravertebral facet joint block at B/L L4-5, L5-S1 on Plaintiff.  A.R. 409.  Dr. Weissman noted that the procedure was "uneventful," that Plaintiff "tolerated the procedure well and experienced immediate pain relief," and that "after a short recovery, [Plaintiff] was discharged to home."  A.R. 409.

On July 15, 2011, Dr. Weissman performed a second lumbar paravertebral facet joint block at B/L L4-5, L5-S1 on Plaintiff.  A.R. 402.  Dr. Weissman noted that the procedure was

"uneventful," that Plaintiff "tolerated the procedure well and experienced immediate pain relief," and that "after a short recovery, [Plaintiff] was discharged to home." A.R. 402.

On July 20, 2011, State Agency medical consultant Timothy Doderer determined that Plaintiff had back-discogenic and degenerative disorders, and gave her an RFC for light exertional work. A.R. 53; *see also* A.R. 49-57.

On August 10, 2011, Dr. Weissman performed a third lumbar paravertebral facet joint block at B/L L4-5, L5-S1 on Plaintiff. A.R. 395. Dr. Weissman noted that the procedure was "uneventful," that Plaintiff "tolerated the procedure well and experienced immediate pain relief," and that "after a short recovery, [Plaintiff] was discharged to home." A.R. 395.

On September 6, 2011, Dr. Weissman performed a paravertebral facet Joint Block B/L C6-7, C7-T1 procedure on Plaintiff. A.R. 387. Dr. Weissman noted that the procedure was "uneventful," that Plaintiff "tolerated the procedure well and experienced immediate pain relief," and that "after a short recovery, [Plaintiff] was discharged to home." A.R. 387.

On March 29, 2012, Arthur Pirone, M.D., a State agency physician consultant, reviewed Plaintiff's file and indicated that Plaintiff could perform a full range of light work and could stand/walk 6 hours in an 8 hour day and sit up to 6 hours in an 8 hour day. A.R. 55.

On October 7, 2012, Wei Ma, M.D., a clinical neurophysiologist, performed an EMG on Plaintiff. A.R. 251-53. Dr. Ma noted that Plaintiff was a "46 year old woman who complains of lifelong neck pain and discomfort that has gradually worsened, particularly in the last ten years, with radiation to both arms, right greater than left." A.R. 251. Dr. Ma reported that "[i]n all of the muscles sampled, there was a normal interference pattern with maximum effort" and that "[t]here was no abnormal spontaneous activity detected in any muscles sampled." A.R. 253. Dr. Ma's impression provided "[t]his was a normal electrophysiological study with no evidence of

active radiculopathy, polyneuropathy, mononeuropathy or myopathy, however chronic radiculopathy can not [be] exclude[d]."  A.R. 253.

On March 6, 2013, Robert Walsh, M.D., another State agency physician, reviewed the medical evidence and also concluded that Plaintiff could perform a full range of light work. However, Plaintiff at that time had mental impairments, and based on a review of her mental health records (which did not start until July 2011) by a state agency psychiatrist, she was found disabled as of May 11, 2011 due to marked and moderate limitations in her mental functioning.  A.R. 58, 64-66.

### B.    Review of Disability Determinations

On May 25, 2011, Plaintiff applied for social security disability insurance benefits, alleging disability beginning on December 11, 2009.  A.R. 166-72.  On August 31, 2011, the Social Security Administration denied Plaintiff's claim for disability benefits, A.R. 73-78, finding:

- While you still experience some pain in your lower back, there is no severe muscle weakness or loss of feeling in your limbs.

- While you still experience some pain in your neck, there is no severe muscle weakness or loss of feeling in your limbs.

- You do have pain.  However, it does not limit your ability to move about and use your limbs.

- You do have interstitial cystitis, pelvic floor dysfunction, and vulvodynia. Although it causes you some discomfort, it has not caused complications which prevent you from working.

A.R. 73-74.  The Administration concluded:  "[b]ased on the description of your job as a waitress, we have concluded that you cannot do this job as you had previously performed it.  However, you can do the job as it is generally performed."[3]  A.R. 74.

---

[3] It is unclear why the Administration originally considered the position of "waitress," and not "teacher's assistant," as Plaintiff's previous occupation.

On February 15, 2012, the Social Security Administration found that Plaintiff was disabled as of May 15, 2011, based on an additional severe mental impairment but not prior thereto.  A.R. 84-85, 86-87.  Specifically the Administration found:

> Although you stated that you were unable to work in 12/2009 the medical evidence that we were able to obtain from medical sources you listed for us did not confirm this as showing you were unable to work at that time.  We are, however, able to find that you were disabled as of 5/5/2011 due to the significant worsening of your mental health problems.  Thus, this determination of disability will be made effective as of 5/15/2011.

A.R. 84.

### C.    Review of Testimonial Record

Plaintiff testified that she is right handed, 5'5" tall, and weighs 98 pounds.  A.R. 32. Plaintiff completed up to the 11th grade, has obtained her G.E.D., and affirmed that she can read and write and perform simple math.  A.R. 32.

Plaintiff testified that she is not currently working, and claimed she last worked on December 7, 2009 as a teacher's assistant, before she injured her back in December of 2009.  A.R. 32-33.  Plaintiff stated her injury did not occur on the job, and she did not receive anything from the school system because of her injury.  A.R. 33.  Plaintiff claimed at the hearing that she stopped working after her injury because she "was a teacher assistant with Cerebral Palsy children, and when [she] injured [her] back [she] could no longer lift them in and out of wheelchairs.  We have to lift the children in and out of wheelchairs, changing tables . . . put them in standers, walkers."[4] A.R.  33.  Plaintiff estimated that she was required to lift on "average 60 pounds" because the students "ranged from six-month-old to 21-year-old."  A.R. 33.

---

[4] In a Function Report, Plaintiff asserted that she was "laid off" from this position in March 2010, not due to any alleged disability, but "possibly" because she "witness[ed] [a] teacher inappropriately touching a student."  A.R. 199.

Plaintiff described her typical day following her back injury as "[e]xcurciating pain," and stated that she went to the chiropractor the following Monday.  A.R. 34.  After her injury, she testified that she could do "[n]othing."  A.R. 35.  As she explained:  "I couldn't -- I could get up and push the button, and make a pot of coffee."  A.R. 35.  She stated that, with the exception of dusting, she was unable to do household chores.  A.R. 35.  When Plaintiff was injured, she lived with her husband and son, A.R. 35, but now lives alone, A.R. 32, because her son is 24 and she "had to flee the residence because of domestic violence, abuse, physical, emotional" in June 2010. A.R. 42.

Plaintiff testified that her regular weight when she was working was 154 pounds, and now she's 98-100 pounds.  A.R. 40.  She stated the weight loss occurred because of "[s]tress, pain, [she] couldn't swallow, [or] chew food[.]"  A.R. 41.  Plaintiff testified that she attended physical therapy, which helped, and that she attended as long as her insurer paid for it.  A.R. 36.  As Plaintiff explained:  "I was able to function better.  I was able to do light yoga like I used to.  I was able to run a light vacuum.  I was able to lift light [weight.]"  A.R. 36.  However, she stated that even with physical therapy, she did not feel like she could go back to even a sit-down job "because [her] back is so bad that [she] can't [sit] without a pillow.  I have to actually stand every few minutes."  A.R. 36.  She estimated that she is able to walk 20-25 feet of distances up to "half a block," stand for 30 minutes, and sit for 10 minutes before needing to rest.  A.R. 37, 39.  She testified that sitting was more difficult than standing for her.  A.R. 38.  She testified that she could lift only a half-gallon of milk.  A.R. 38.

Plaintiff described her problem with her lower back as "[d]iscs pushing on nerves, perhaps broken discs because of the severe Degenerative Disc Disease."  A.R. 43.  Plaintiff explained the delay between her MRI in February 2010, and her eventual surgery in June of 2011 as follows:

"Because every doctor that I went to look[] and said that I was too complicated and would not take me until I found Dr. Ho in Newark working out of Beth Israel, and he told me 'I'm not afraid of you, and I'm going to fix you.'" A.R. 44. However, Plaintiff also testified that the reason why the doctors she visited would not perform surgery on her was because they did not perform the kind of surgery she needed. A.R. 44-45.

### D.     ALJ's Findings

ALJ Hillegas issued a written decision on September 23, 2013. A.R. 11-22. The ALJ began by finding that Plaintiff met the insured status requirement of the Social Security Act to remain insured through June 30, 2015. A.R. 11, 13. Next, the ALJ applied the standard five-step process to determine if Plaintiff had satisfied her burden of establishing disability for the time period between December 11, 2009 and May 15, 2011.

First, the ALJ found that Plaintiff had not engaged in substantial gainful activity since December 11, 2009, the alleged onset date. A.R. 13.

Second, the ALJ found that Plaintiff had the following severe impairments for the relevant time period: cervical and lumbar degenerative disc disease. A.R. 13-14. With respect to Plaintiff's impairments of interstitial cystitis, pelvic floor dysfunction, and vulvodynia, the ALJ noted that "there is minimal clinical evidence in the record to corroborate or support any finding of significant vocational impact related to these condition." A.R. 14. As the ALJ found:

> While Ms. Powers has alleged suffering from interstitial cystitis, pelvic floor dysfunction, and vulvodynia, she has failed to overcome her burden of proof that these conditions caused more than minimal functional limitations for a period of twelve consecutive months from December 11, 2009 to May 15, 2011. Dr. Kristene Whitmore has treated Ms. Powers . . . and characterized her condition as stable on September 13, 2010. Of note are . . . the doctor's comments of April 18, 2011[,] when she reported positive findings of a bladder scan that morning showing good emptying capacity and decreased bladder spasm. Moreover, this doctor's treatment records fail to document significant functional restrictions resulting from any impairment.

12

A.R. 14 (citations omitted).

Third, the ALJ found that, for the time period between December 11, 2009 and May 15, 2011, Plaintiff did not have an impairment, or a combination of impairments, that meets or medically equals the severity of one of the listed impairments under the Act that would qualify for disability benefits.  A.R. 14-15.  In this step, the ALJ considered section 1.04 (Disorders of the spine).  The ALJ specifically noted that "no treating or examining physician has mentioned findings equivalent in severity to any Listed impairment."  A.R. 15.

Fourth, the ALJ found that, for the time period between December 11, 2009 and May 15, 2011, Plaintiff had the residual functional capacity to perform "the full range of light work" as defined in 20 C.F.R. § 404.1567(a).  A.R. 15-20.  In reaching this RFC determination, the ALJ extensively reviewed Plaintiff's statements concerning her physical conditions, as well as her medical records concerning her alleged physical impairments.  *See* A.R. 15-20.

The ALJ considered Plaintiff's subjective complaints and stated functional limitations, but found that, for the period from December 11, 2009, to May 15, 2011, the medical record did not support her claims that her impairments were as severe as she contended.  *See id.*  In addition to his review of the medical record, the ALJ also discounted Plaintiff's testimony based on the fact that (1) she continued to work for several months during the period of alleged disability, and only stopped in March 2010 for reasons unrelated to her alleged disability and (2) that she had received unemployment benefits for the period of October 4, 2010 to April 4, 2011, which required her to certify that she was ready, willing, and able to work during that time period.[5]  A.R. 19; *see also* A.R. 164, 173.

---

[5] In this regard, it appears the ALJ did not credit Plaintiff's testimony that she stopped working in December 2009 due to her alleged physical limitations.  *See* A.R. 32-33.   Indeed,

Of particular relevance to this appeal is the ALJ discussion of the medical opinions of Drs. Botwin, Novik, and Ho.  The ALJ criticized these doctors' surgical recommendations, primarily because they relied upon a history of failed conservative treatment which was absent from the record.  With respect to Dr. Botwin, the ALJ noted "Dr. Botwin cited the claimant having undergone trigger point injection, physical therapy, and a series of cervical epidural steroid injection[s] within the past six months, yet there are not records of such care in evidence."  A.R. 18.  For Dr. Novik, the ALJ noted his surgical recommendation "would appear . . . [to be] based on allegations of extensive conservative treatment history that is not in the evidence, which diminishes the validity of his surgical opinion."  A.R. 18.  And, with respect to Dr. Ho's examination and subsequent surgery, the ALJ opined:

> Dr. Victor Ho first saw Ms. Powers on May 16, 2011 for a neurological evaluation and supplied an overall impression of lumbar spondylosis with L4-S and L5-S1 disk space degeneration and cervical spondylosis with C4-5 and C5-6 disk space changes.  Based on this single examination, the doctor planned surgery involving an anterior cervical decompression and fusion at C4-5 and C5-6 with a donor bone graft and stabilization plating, which was performed in June 2001.  It is unclear why the doctor would recommend surgery without evidence of conservation care.

AR. 18.  The ALJ then reviewed the July 19, 2011 determination of State Agency medical consultant Doderer, which concluded Plaintiff could perform the full range of light work because she was "able to lift and carry ten pounds frequently and twenty pounds occasionally, could stand, sit, or walk for about six hours out of eight hours during a workday, and had unlimited push/pull abilities."  A.R. 18.  The ALJ gave this opinion "great weight as it pertains to the period from December 11, 2009 to May 5, 2011 because it is consistent with the records as a whole and [the] consults is an expert in Social Security disability evaluation."  A.R. 18.

---

Plaintiff's earning report shows that she worked for Cerebral Palsy League of Union from 2005 to 2010.  A.R. 177-78.

14

The ALJ determined that, for the time period between December 11, 2009 and May 15, 2011, Plaintiff was capable of performing her past relevant work, as a teacher's assistant, DOT # 099.327-010, as it is generally performed in the national economy.  A.R. 20-21.

Accordingly, the ALJ concluded that Plaintiff was not disabled during the time period between December 11, 2009 and May 15, 2011.  A.R. 21-22.

## II.   STANDARD OF REVIEW

On a review of a final decision of the Commissioner of the Social Security Administration, a district court "shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g); *see Matthews v. Apfel*, 239 F.3d 589, 592 (3d Cir. 2001).  The Commissioner's decisions regarding questions of fact are deemed conclusive on a reviewing court if supported by "substantial evidence in the record."  42 U.S.C. § 405(g); *see Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).  While the court must examine the record in its entirety for purposes of determining whether the Commissioner's findings are supported by substantial evidence, *Gober v. Matthews*, 574 F.2d 772, 776 (3d Cir. 1978), the standard is highly deferential.  *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004).  Indeed, "substantial evidence" is defined as "more than a mere scintilla," but less than a preponderance. *McCrea v. Comm'r of Soc. Sec.*, 370 F.3d 357, 360 (3d Cir. 2004).  "It means such relevant evidence as a reasonable mind might accept as adequate."  *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999).  A reviewing court is not "empowered to weigh the evidence or substitute its conclusions for those of the fact-finder."  *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992), *cert. denied*, 507 U.S. 924 (1993).  Accordingly, even if there is contrary evidence in the record

15

that would justify the opposite conclusion, the Commissioner's decision will be upheld if it is supported by the evidence. *See Simmonds v. Heckler*, 807 F.2d 54, 58 (3d Cir. 1986).

Disability insurance benefits may not be paid under the Act unless Plaintiff first meets the statutory insured status requirements. *See* 42 U.S.C. § 423(c). Plaintiff must also demonstrate the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. . . ." 42 U.S.C. § 423(d)(1)(A); *see Plummer*, 186 F.3d at 427. An individual is not disabled unless "his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). Eligibility for supplemental security income requires the same showing of disability. *Id.* at § 1382c (a)(3)(A)-(B).

The Act establishes a five-step sequential process for evaluation by the ALJ to determine whether an individual is disabled. *See* 20 C.F.R. § 404.1520. First, the ALJ determines whether the claimant has shown that he or she is not currently engaged in "substantial gainful activity." *Id.* at § 404.1520(a); *see Bowen v. Yuckert*, 482 U.S. 137, 146-47 n.5 (1987). If a claimant is presently engaged in any form of substantial gainful activity, he or she is automatically denied disability benefits. *See* 20 C.F.R. § 404.1520(b); *see also Bowen*, 482 U.S. at 140. Second, the ALJ determines whether the claimant has demonstrated a "severe impairment" or "combination of impairments" that significantly limits his physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c); *see Bowen*, 482 U.S. at 146-47 n.5. Basic work activities are defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1521(b). These activities

include physical functions such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling." *Id.* A claimant who does not have a severe impairment is not considered disabled. *Id.* at § 404.1520(c); *see Plummer*, 186 F.3d at 428.

Third, if the impairment is found to be severe, the ALJ then determines whether the impairment meets or is equal to the impairments listed in 20 C.F.R. Pt. 404, Subpt. P., App. 1 (the "Impairment List"). 20 C.F.R. § 404.1520(a)(4)(iii). If the claimant demonstrates that his or her impairments are equal in severity to, or meet those on the Impairment List, the claimant has satisfied his or her burden of proof and is automatically entitled to benefits. *See id.* at § 404.1520(d); *see also Bowen*, 482 U.S. at 146-47 n.5. If the specific impairment is not listed, the ALJ will consider in his or her decision the impairment that most closely satisfies those listed for purposes of deciding whether the impairment is medically equivalent. *See* 20 C.F.R. § 404.1526(a). If there is more than one impairment, the ALJ then must consider whether the combination of impairments is equal to any listed impairment. *Id.* An impairment or combination of impairments is basically equivalent to a listed impairment if there are medical findings equal in severity to all the criteria for the one most similar. *Williams*, 970 F.2d at 1186.

If the claimant is not conclusively disabled under the criteria set forth in the Impairment List, step three is not satisfied, and the claimant must prove at step four whether he or she retains the "residual functional capacity" ("RFC") to perform his or her past relevant work. 20 C.F.R. § 404.1520(e); *Bowen*, 482 U.S. at 141. If the claimant is able to perform previous work, the claimant is determined to not be disabled. 20 C.F.R. §§ 404.1520(e), 416.920(e); *Bowen*, 482 U.S. at 141-42. The claimant bears the burden of demonstrating an inability to return to the past relevant work. *Plummer*, 186 F.3d at 428. Finally, if it is determined that the claimant is no longer able to perform his or her previous work, the burden of production then shifts to the Commissioner to

17

show, at step five, that the "claimant is able to perform work available in the national economy." *Bowen*, 482 U.S. at 146-47 n.5; *Plummer*, 186 F.3d at 428.  This step requires the ALJ to consider the claimant's residual functional capacity, age, education, and past work experience.  20 C.F.R. § 404.1520(f).  The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether the claimant is capable of performing work and not disabled.  Id.

## III.    PLAINTIFF'S CLAIMS ON APPEAL

Plaintiff makes four arguments on appeal as to why the ALJ's disability determination must be remanded and/or reversed.[6]  First, Plaintiff argues that the ALJ erred at Step Two by failing to find that Plaintiff's interstitial cystitis, pelvic floor dysfunction, and vulvodynia were severe impairments, either alone or in combination, without any discussion of what these diseases actually mean or how they affected Plaintiff.  Second, Plaintiff argues that the ALJ's failure to find the above-impairments were severe at Step Two also affected the analysis at Step Three, where the ALJ did not consider them alongside the severe spinal impairments the ALJ found at Step Two.  Third, Plaintiff argues that the RFC issued at Step Four is flawed because the ALJ failed to obtain a medical opinion to establish the onset date of her disability.  Fourth, Plaintiff argues that the ALJ erred at Step 4 by concluding Plaintiff could perform her past work of Teacher Aide I, DOT# 099.327-010, which is light exertion, because her past work was actually that of a Child-Care Attendant – School, DOT # 355.674-010, which is medium exertion.  The Court shall address each argument in turn.

### A.    The ALJ Properly Found that Plaintiff's Interstitial Cystitis, Pelvic Floor Dysfunction, and Vulvodynia were Non-Severe Impairments

---

[6] The Court notes that the Commissioner's Answer, along with the administrative record, was filed on August 17, 2015.  Local Civil Rule 9.1(e)(1) requires social security plaintiffs to file their brief within 75 days of the filing of the Answer.  Accordingly, Plaintiff's brief, filed on February 16, 2016, by her attorneys James Langton, Esq., and Abraham S. Alter, Esq., is 109 days late.

Plaintiff argues that the ALJ erred at Step Two by finding that Plaintiff's interstitial cystitis, pelvic floor dysfunction, and vulvodynia were non-severe impairments, either alone or in combination, without any discussion of what these diseases actually mean or how they affected Plaintiff.

Plaintiff bears the burden at step two of the sequential evaluation process to prove that she has a severe impairment. *See Bowen*, 482 U.S. at 146 n.5; *Foley v. Comm'r of Soc. Sec.*, 349 Fed. App'x. 805, 808 (3d Cir. 2009). The inquiry into an impairment's severity at Step 2 of the sequential evaluation "is a *de minimis* screening device to dispose of groundless claims*." Newell v. Comm'r of Soc. Sec.*, 347 F.3d 541, 546 (3d Cir. 2003). An impairment or combination of impairments is not severe if it does not significantly limit a claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1521(a). The regulations define basic work activities as the abilities or aptitudes necessary to do most jobs. *Id.* at § 404.1521(b). Thus, an impairment is not severe if the evidence establishes only a slight abnormality that has no more than a minimal effect on an individual's ability to work. *Newell*, 347 F.3d at 546; *Mays v. Barnhart*, 78 F. App'x 808, 811 (3d Cir. 2003). "Reasonable doubts on severity are to be resolved in favor of the claimant." *Newell*, 347 F.3d at 547 (footnote omitted).

While an ALJ is entitled to weigh the credibility of the evidence presented to him, he must give some indication of the evidence he rejects and the reasons for rejecting that evidence. *See Fargnoli v. Halter*, 247 F.3d 34, 43 (3d Cir. 2001). Otherwise, the reviewing court cannot tell if "significant probative evidence was not credited or simply ignored." *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981). "[A]n ALJ's complete disregard of an impairment at Step Two and in the remaining parts of the sequential analysis can constitute grounds for remand." *Pailin v. Colvin*, No. 10-4556, 2013 U.S. Dist. LEXIS 158100, *9-10 (E.D. Pa. Nov. 5, 2013) (citing *Rupard v.*

*Astrue*, 627 F. Supp. 2d 590, 596 (E.D. Pa. 2009)). "This is especially true if the ALJ fails to consider any limitations caused by the omitted impairment during his RFC assessment." *Shaffer v. Colvin*, No. 14-1114, 2015 U.S. Dist. LEXIS 87317, *17 (W.D. Pa. July 6, 2015) (citation omitted).

As the ALJ correctly observed, a review of the medical record shows that there is little evidence that Plaintiff's interstitial cystitis, pelvic floor dysfunction, and vulvodynia were severe impairments. Records from Plaintiff's primary ob-gyn care, Dr. Whitmore, indicate that she had bladder spasms along with urinary pain and difficulties urinating, *see* A.R. 272-73, 290, but there is no indication that these impairments "significantly limits [Plaintiff's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(a)(ii), (c). Indeed, although Plaintiff listed these impairments in her application, she did not testify that they impaired her ability to do basic work activities in any way at the hearing. Moreover, Dr. Whitmore's notes indicate Plaintiff underwent Insterstim surgery near the beginning of the alleged disability period, which resolved her urethra spasms and resulted in "better bladder function." A.R. 270. On January 3, 2011, Plaintiff indicated to Dr. Whitmore that, following her InterStim surgery, her symptoms were "99% better" and that she was able to fully evacuate her bladder when urinating and her urination frequency was reduced by half. A.R. 267.

Accordingly, the Court finds that the ALJ's decision finding that Plaintiff's interstitial cystitis, pelvic floor dysfunction, and vulvodynia were non-severe impairments was supported by substantial evidence.

**B.   The ALJ's Analysis at Step Three Appropriately Considered all of Plaintiff's Severe Impairments.**

Plaintiff's challenge to the ALJ's analysis at Step Three relies entirely on her argument that the ALJ should have found her interstitial cystitis, pelvic floor dysfunction, and vulvodynia were

severe impairments, and, therefore, should have been considered in Step Three as well.  As discussed above, this Court finds that the ALJ's conclusion that Plaintiff's interstitial cystitis, pelvic floor dysfunction, and vulvodynia were not severe impairments was supported by substantial evidence and, therefore, similarly finds that the ALJ's properly did not consider those impairments at Step Three in the disability analysis.

### C.      The ALJ Erred in Rejecting Plaintiff's Treating Physicians' Opinions when Determining that Plaintiff did Not have Exertional Limitations.

As a preliminary matter, the Court notes that the scattered style of Plaintiff's briefing on this issue renders analysis of her arguments difficult.  It appears that Plaintiff is arguing that the ALJ improperly concluded that Plaintiff had no exertional limitations during the alleged period of disability, despite the fact that Plaintiff was required to undergo back surgery in June 2011. Instead, Plaintiff argues that the very fact that surgery was performed in June 2011 proves she must have experienced disabling limitations sometime prior to that surgery – during the period of alleged disability – and, therefore, the ALJ was required to obtain a medical opinion, pursuant to SSR 83-20, to determine the onset date of Plaintiff's alleged disability.  As discussed in more detail below, this Court disagrees with Plaintiff's argument.  However, the Court finds that the ALJ erred in rejecting the uncontradicted medical opinions of Plaintiff's treating physicians that she suffered exertional limitations in April 2011 – during the period of alleged disability – and, therefore, remands to the ALJ to reexamine Plaintiff's RFC.

"Under SSR 83-20, [an] ALJ is required to call a medical expert in cases . . .  where the onset date of disability must be inferred." *Gibbs v. Comm'r of Soc. Sec.*, 280 Fed. App'x. 194 (3d Cir. 2008) (citing *Newell*, 347 F.3d at 549).  Importantly, "[t]he purpose of . . . SSR 83-20, is to describe the relevant evidence to be considered when establishing the onset date of disability, not

whether disability exists." *Zirnsak v. Colvin*, 777 F.3d, 607, 613 (3d Cir. 2014) (emphasis and internal quotation marks omitted).

> According to SSR 83-20, the ALJ must consider the claimant's allegations, the claimant's work history, and medical and other evidence in determining onset date. SSR 83-20 acknowledges that "[w]ith slowly progressive impairments, it is sometimes impossible to obtain medical evidence establishing the precise date an impairment became disabling," particularly where the date last worked is "far in the past and adequate medical records are not available." In such cases, SSR 83-20 instructs the ALJ to "infer the onset date" from the evidence but requires that the ALJ's judgment "have a legitimate medical basis." SSR 83-20 further provides that the ALJ should call on a medical expert when onset must be inferred.

*Orquera v. Comm'r of Soc. Sec.*, 416 Fed. App'x. 139, 141-42 (3d Cir. 2008) (citations omitted).

"The Third Circuit has explained that SSR 83-20 provides for the assistance of a medical advisor only where 'the impairment at issue is slowly progressing and the alleged onset date is so far in the past that obtaining adequate medical records is impossible.'" *Holmes v. Colvin*, No. 14-7824, 2015 U.S. Dist. LEXIS 123441, *18 (D.N.J. Sept. 14, 2015) (quoting *Thelosen v. Comm'r of Soc. Sec.*, 384 F. App'x 86, 91 (3d Cir. 2010)). That is not the case here. Plaintiff's alleged onset date is not an ambiguous target in the far distant past – it is December 11, 2009. Further, Plaintiff appears to argue that she could have produced additional medical records to support the medical opinions of Drs. Botwin, Novik, and Ho had the ALJ given her an opportunity to provide them. *See* Pl. Br. 18. Therefore, the ALJ was not required to obtain a medical opinion under SSR 83-20 to infer the onset date of Plaintiff's alleged disability. *See TheLosen*, 384 Fed. Appx. at 91.

However, while this Court holds that the ALJ was not required to obtain the assistance of a medical advisor pursuant to SSR 83-20, I do take issue with the ALJ's conclusion that Plaintiff's RFC had no exertional limitations whatsoever at Step Four. Although the ALJ criticized the surgical recommendations of Drs. Botwin, Novik, and Ho because they premised their opinions on a history of failed conservative treatment, which were absent from the record, *see* A.R. 18, that

does not justify the ALJ's rejection of the observations these doctors made of Plaintiff's limitations, such as Dr. Novik's observation of April 14, 2011, that Plaintiff had "decreased range of motion in the cervical spine with pain in all directions[d] . . [d]iminished motor function in the upper extremity 4/5[,] [and] [d]iminished sensory response bilaterally in the projection of the C6 dermatome." A.R. 255.

An ALJ generally must give "more weight" to opinions from treating physicians, 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2), and when the medical evidence conflicts, "the ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.'" *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (quoting *Plummer*, 186 F.3d at 429). However, "[i]n choosing to reject the treating physician's assessment, an ALJ may not make 'speculative inferences from medical reports' and may reject 'a treating physician's opinion outright only on the basis of contradictory medical evidence' and not due to his or her own credibility judgments, speculation or lay opinion." *Id.* at 317-18 (citations omitted).

Here, there was *no* conflict in the medical opinions that Plaintiff had some sort of exertional limitations in April of 2011 – during the period of alleged disability – as all three doctors who observed her in April 2011 noted limitations of some variety. Instead, the ALJ relied upon, and gave "great weight" to, the July 2011 report of a State Agency medical consultant that was issued *after* Plaintiff's June 2011 surgery, which found Plaintiff capable of performing the full range of light work. However, whether Plaintiff could perform work in July 2011– *after* Dr. Ho performed surgery on Plaintiff in June 2011 – is irrelevant as the Commissioner has already determined that Plaintiff was disabled based on a mental impairment as of May 15, 2011.

To be sure, Plaintiff bears the "burden of demonstrating that she lacks the RFC to perform her past relevant work" during the alleged period of disability, from December 2009 to May 2011.

23

*Garrett v. Comm'r of Soc. Sec.*, 274 Fed. App'x. 159, 163 (3d Cir. 2008) (citing *Plummer*, 186 F.3d at 428). As the ALJ observed, Plaintiff continued to work from December 2009 until March 2010 – with Plaintiff giving contradictory accounts of why she was terminated, stating both that it was because of her alleged disability and for an unrelated incident. *See* A.R. 33, 199. And she represented that she was able to work, in order to receive unemployment benefits, from approximately October 2010 to April 2011. A.R. 19; *see also* A.R. 164, 173. Plaintiff did not seek out pain treatment until April 2011, and her earlier medical records showed that Plaintiff only had "minimal" and "mild" symptoms. Nevertheless, Plaintiff also produced uncontradicted medical evidence that noted the potential existence of exertional limitations during the time period from April 2011 to May 2011 – a short period, but one which fell within the alleged period of disability.[7]

Accordingly, this matter is remanded to the ALJ for consideration of whether Plaintiff's residual functional capacity should have included the exertional limitations observed by Drs. Botwin, Novik, and Ho in April and May 2011. In addition, Plaintiff should produce any and all medical records that she contends exist to support any exertional limitations she claims she has experienced at any time during the alleged period of disability from December 11, 2009 to May 15, 2011.

D.     **Plaintiff's Past Relevant Work.**

Because the Court has determined that a remand is appropriate, it will not address Plaintiff's remaining arguments. However, the Court notes that Plaintiff has argued her past

---

[7] The Court does not address whether these medical records are sufficient to support a finding that Plaintiff did, in fact, have exertional limitations in April and May 2011, but rather only that the ALJ should have considered these records and explained why he accepted or rejected these doctors' medical opinions.

relevant work was that of a "Child-Care Attendant – School," DOT # 355.674-010,[8] a job with a medium exertional requirement, and not a "Teacher Aide I," DOT # 099.327-010,[9] a job with a light-exertional requirement, as identified by the ALJ.   On remand, the ALJ should consider whether his identification of Plaintiff's past relevant work was accurate in light of her testimony describing her previous job and her educational history when determining whether Plaintiff has sustained her burden at Step Four of the disability analysis, *i.e.*, whether she has the residual functional capacity (with or without exertional limitations) to perform her past relevant work.

## IV.    CONCLUSION

For the reasons set forth above, I find that the ALJ's decision was not supported by substantial evidence in the record.  Accordingly, the ALJ's decision in this matter is remanded for consideration of whether Plaintiff's RFC should include any exertional limitation during the alleged period of disability.  An appropriate Order will follow.

Dated: June 28, 2016

/s/ The Honorable Freda L. Wolfson

---

[8] "Attends to personal needs of handicapped children while in school to receive specialized academic and physical training: Wheels handicapped children to classes, lunchrooms, treatment rooms, and other areas of building. Secures children in equipment, such as chairs, slings, or stretchers, and places or hoists children into baths or pools. Monitors children using life support equipment to detect indications of malfunctioning of equipment and calls for medical assistance when needed. Helps children to walk, board buses, put on prosthetic appliances, eat, dress, bathe, and perform other physical activities as their needs require."  DOT # 355.674-010.

[9] "Performs any combination of following instructional tasks in classroom to assist teaching staff of public or private elementary or secondary school: Discusses assigned teaching area with classroom teacher to coordinate instructional efforts. Prepares lesson outline and plan in assigned area and submits outline to teacher for review. Plans, prepares, and develops various teaching aids, such as bibliographies, charts, and graphs. Presents subject matter to students, utilizing variety of methods and techniques, such as lecture, discussion, and supervised role playing. Prepares, administers, and grades examinations. Assists students, individually or in groups, with lesson assignments to present or reinforce learning concepts. Confers with parents on progress of students. May specialize in single subject area. May be required to have completed specified number of college education credits."  DOT # 099.327-010.

United States District Judge